# 24-2814-CV

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

➤➤ ◄◄

BAT LLC,

*Plaintiff-Appellant,*

*v.*

TD BANK N.A., HALIFAX SECURITY, INC., DOING BUSINESS AS
NORTH AMERICAN VIDEO, INTEGRATED SECURITY SYSTEMS,

*Defendants-Cross-Defendants-Appellees,*

LYDIA SECURITY MONITORING INC.,
DOING BUSINESS AS COPS MONITORING,

*Defendant-Cross-Claimant-Appellee,*

SECURECOM WIRELESS LLC,

*Defendant-Cross-Defendant,*

ADT LLC, SECURITY AND DATA TECHNOLOGIES, INC.,

*Defendants.*

_____

*On Appeal from the United States District Court
for the Eastern District of New York*

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

Joseph Zelmanovitz
STAHL & ZELMANOVITZ
747 3rd Avenue, Suite 33B
New York, New York 10017
212-826-6422

Elliot Hahn
HAHN EISENBERGER PLLC
969 East 27th Street
Brooklyn, New York 11210
347-410-5800

*Attorneys for Plaintiff-Appellant*

 PHP (212) 719-0990
appeals@phpny.com

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BAT LLC,

*Plaintiff-Appellant,* | Case No. 24-2814

*v.*

TD BANK N.A., HALIFAX SECURITY, INC.,
DOING BUSINESS AS NORTH AMERICAN VIDEO,
INTEGRATED SECURITY SYSTEMS,

*Defendants-Cross-Defendants-Appellees,*

LYDIA SECURITY MONITORING INC.,
DOING BUSINESS AS COPS MONITORING,

*Defendant-Cross-Claimant-Appellee,*

SECURECOM WIRELESS LLC,

*Defendant-Cross-Defendant,*

ADT LLC, SECURITY AND
DATA TECHNOLOGIES, INC.,

*Defendants.*

Pursuant to Federal Rules of Appellate Procedure 26.1, the undersigned

counsel of record for a private (non-governmental) party certifies that Plaintiff-

Appellant BAT LLC, is not a publicly held company, does not have any corporate

parents, subsidiaries, or affiliates which are publicly held, nor does any publicly

held corporation own 10 percent or more of the stock of this entity.

<u>/s/ Elliot Hahn</u>
ELLIOT HAHN
HAHN EISENBERGER PLLC
969 East 27th Street
Brooklyn, New York 11210
(347) 410-5800
ehahn@hahneisenberger.com

*Co-Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................1

JURISDICTIONAL STATEMENT .......................................................1

    A.  District Court Subject Matter Jurisdiction .................................1

    B.  Court of Appeals Jurisdiction.....................................................2

    C.  Filing Dates .................................................................................2

    D.  Final Judgment ............................................................................2

STANDARD OF REVIEW ...................................................................2

ISSUES FOR REVIEW ........................................................................3

STATEMENT OF THE CASE...............................................................3

    A.  Nature of the Action...................................................................3

    B.  Course of the Proceedings..........................................................6

STATEMENT OF FACTS .....................................................................7

    TD's Branch .......................................................................................7

    Box 198 ..............................................................................................9

    The Appraisal ...................................................................................12

    The Burglary ....................................................................................13

    Assignments to BAT ........................................................................15

    The Spoliation ..................................................................................16

SUMMARY OF ARGUMENT..............................................................18

i

**POINT** I

    SUMMARY JUDGMENT SHOULD HAVE BEEN DENIED TO
DEFENDANTS ...............................................................................20

POINT II

    THE ASSIGNMENTS CONFER STANDING ................................22

        A.  The Assignments Are Valid ...............................................22

        B.  The Bienenstock Assignment Confers Standing.................24

        C.  The Assignments from the Owners Confer Standing .........30

POINT III

    THE DISTRICT COURT SHOULD HAVE GRANTED BAT
LEAVE TO AMEND THE COMPLAINT ......................................37

        A.  Plaintiff Did Not Delay And Any Time Lag Was
Excusable..........................................................................41

        B.  There Was No Prejudice to Defendants .............................44

        C.  The Amendment Is Not Futile............................................45

POINT IV

    SUMMARY JUDGMENT SHOULD HAVE BEEN GRANTED
AGAINST TD AND FOR A FINDING OF SPOLIATION
AGAINST TD AND HALIFAX.......................................................46

        A.  Summary Judgment Should Have Been Awarded to BAT.................46

        B.  TD And Halifax Spoliated Evidence..................................50

CONCLUSION ........................................................................................55

CERTIFICATE OF COMPLIANCE.......................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
106 F.3d 11 (2d Cir. 1997) ..................................................................*passim*

*Allhusen v. Caristo Constr. Corp.*,
303 N.Y. 446 (1952) .............................................................................26

*Am. Optical Co. v. Curtiss*,
56 F.R.D. 26 (S.D.N.Y. 1971) ..............................................................44

*Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.*,
435 N.Y.S.2d 438 (N.Y.Sup.Ct.1980),
*aff'd as modified on other grounds,* 81 A.D.2d 650
(N.Y.App. Div.2d Dep't 1981),
*aff'd without opinion,* 54 N.Y.2d 891 (1981) ......................................49

*Berger v. 34th St. Garage*,
274 A.D. 414 (1st Dep't 1948) .......................................................25, 26

*Bluebird Partners v. First Fid. Bank*,
94 N.Y.2d 726, 709 N.Y.S.2d 865 (2000).............................................36

*Byrnie v. Town of Cromwell, Board of Education*,
243 F.3d 93 (2d Cir.2001) .............................................................51, 52

*Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.*,
10 A.D.2d 372, 199 N.Y.S.2d 852 (4th Dep't 1960)......................24, 27

*Cortlandt St. Recovery Corp. v. Hellas Telecomms.*,
790 F.3d 411 (2d Cir. 2015) ..........................................................27, 28

*Deutsche Bank Natl. Trust Co. v. Romano*,
147 A.D.3d 1021, 48 N.Y.S.3d 237 (2d Dep't 2017).........................26

*Dubiner's Bootery, Inc. v. Gen. Outdoor Adver. Co., Inc.*,
10 A.D.2d 923 (1st Dep't 1960)...........................................................50

iii

*Eitzen Chem. A/S v. Carib Petroleum*,
    Case No. 10-Civ.-2351, 2016 U.S. Dist. LEXIS 180304,
    2016 WL 7486017 (S.D. Fl., Dec. 29, 2016) ......................................28

*Esposito v. United States*,
    368 F.3d 1271 (10th Cir. 2004) ................................................39, 43

*Fezzani v. Bear, Stearns & Co.*,
    No. 99 Civ 0793 (PAC), 2021 U.S. Dist. LEXIS 136005,
    2021 WL 311549 (S.D.N.Y., July 21, 2021) ................................28

*Fidelity & Guar. Ins. Corp. v. Ballon*,
    280 A.D. 373, 113 N.Y.S.2d 546 (1st Dep't 1952) ..........................46

*Fujitsu Ltd. v. Federal Express Corp.*,
    247 F.3d 423 (2d Cir.2001) ................................................52, 53

*Grace v. Sterling, Grace & Co.*,
    30 A.D.2d 61 (1st Dep't 1968) ........................................25, 26, 28, 30

*Harris v. Provident Life & Accident Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002) ................................................20

*Hooker v. Eagle Bank of Rochester*,
    30 N.Y. 83 (1864) ........................................................45

*ICC Metals v. Municipal Warehouse Co.*,
    50 N.Y.2d 657, 431 N.Y.S.2d 372 (1980) ................................47

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig*,
    No. 03 MDL 1529 (LMM), 2009 WL 1490599
    (S.D.N.Y. May 21, 2009)................................................41

*In re Air New Orleans, Inc.*,
    No. 04-3241, 2005 U.S. Dist. LEXIS 17754,
    2005 WL 2036678 (E.D. La., Aug. 12, 2005) ................................30

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ........................................31

*In re Stralem*,
    303 A.D.2d 120, 758 N.Y.S.2d 345 (2d Dep't 2003)........................26

iv

*Independent Investor Protective League v. Time, Inc.*,
    50 N.Y.2d 259, 428 N.Y.S.2d 671 (1980) ........................................... 33

*Jay Howard, Inc. v. Rothschild*,
    16 A.D.2d 628, 226 N.Y.S.2d 769 (1st Dep't 1962) ........................ 46

*Jones v. Las Vegas Metro. Police Dep't*,
    873 F.3d 1123 (9th Cir. 2017) ......................................................... 42

*King v. Wang*,
    No. 14-Civ-7694, 2018 U.S. Dist. LEXIS 49659,
    2018 WL 1478044 (S.D.N.Y., March 26, 2018) ............................... 38

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998) ..................................................... 52, 53

*Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*,
    192 F.3d 337 (2d Cir. 1999) ............................................................. 2

*Lang v. Tex. & Pac. Ry. Co.*,
    624 F.2d 1275 (5th Cir. 1980) ....................................................... 31

*Leon v. Martinez*,
    84 N.Y.2d 83, 614 N.Y.S.2d 972 (1994) ........................................ 26

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................ 24

*Marcavage v. City of New York*,
    689 F.3d 98 (2d Cir. 2012) ............................................................. 24

*Matsuchita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................ 20

*Metro. Surgical Inst., LLC v. Cigna*,
    No. 19-15827 (MAS)(LHG), 2020 U.S. Dist. LEXIS 136605,
    2020 WL 4432430 (D.N.J., July 31, 2020) ..................................... 30

*Middle Atlantic Utilities Co. v. S. M. W. Development Corp.*,
    392 F.2d 380 (2d Cir. 1968) ........................................................... 40

*Mineo v. Rand's Food Shops, Inc.*,
    32 N.Y.S.2d 23 (City Ct., N.Y. Co., 1941) ..................................... 34

*Monahan v. New York City Dep't of Corr.*,
    214 F.3d 275 (2d Cir. 2000) ...............................................................40

*Natale v. Ridgefield*,
    927 F.2d 101 (2d Cir. 1991) .................................................................2

*National Credit Union Administration Board, v. Deutsche*
    *Bank Nat'l Tr. Co.*,
    410 F. Supp. 3d 662 (S.D.N.Y. 2019) ...............................................42

*NCUA Bd. V. HSBC Bank US, N.A.*,
    331 F.R.D. 63 (S.D.N.Y. 2019) ..........................................................28

*Nomura Asset Acceptance Corp. Alternative Loan Trust*
    *v. Nomura Credit & Capital, Inc.*,
    139 A.D.3d 519, 31 N.Y.S.3d 863 (1st Dep't 2016) .........................30

*Optimal Strategic U.S. Equity Ltd. v. SPV OSUS Ltd.*,
    54 Misc. 3d 1223(A), 55 N.Y.S.3d 693
    (Sup. Ct., N.Y. Co., 2017) ..................................................................29

*Orbit One Communications, Inc. v. Numerex Corp.*,
    271 F.R.D. 429 (S.D.N.Y. 2010) ...................................................51, 52

*Ouderkirk v. C.N. Bank*,
    119 N.Y. 263, 23 N.E. 875 (1980)......................................................46

*Phoenix Light SF Ltd. v. Bank of Mellon*,
    No. 14-Civ-10104, 2020 U.S. Dist. LEXIS 97865
    (S.D.N.Y., June 3, 2020).....................................................................36

*Pinto v. Allstate Ins. Co.*,
    221 F.3d 394 (2d Cir. 2000) ...............................................................20

*Promenade v. Schindler El. Corp.*,
    39 A.D.3d 221, 834 N.Y.S.2d 97 (1st Dept.2007) ............................36

*Residential Funding Corp. v. Degeorge Financial Corp.*,
    306 F.3d 99 (2nd Cir. 2002) ..........................................................52, 54

*Rule v. Brine*,
    85 F.3d 1002 (2d Cir. 1996) .........................................................21, 37

*Sichel v. Central Fed. Sav. & Loan Assn.*,
  143 Misc.2d 42 (N.Y. Sup. Ct. 1989) ................................................25

*Sotomayor v. City of New York*,
  713 F.3d 163 (2d Cir. 2013) ............................................................2

*SPA Steel Prods., Inc. v. Pizzeria*,
  172 A.D.2d 1002, 568 N.Y.S.2d 979 (3d Dep't 1991).......................34

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
  554 U.S. 269, 128 S. Ct. 2531 (2008)................................22, 23, 25

*Sutton v. Shasta Indus.*,
  No. CV-20-02320-PHX-SMB, 2021 U.S. Dist. LEXIS 158177,
  2021 WL 3709853 (D. AZ, Aug. 20, 2021) ......................................29

*Titus v. Wallick*,
  306 U.S. 282, 59 S. Ct. 557 (1939)..................................................23

*Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc.*
  *v. Love Funding Corp.*,
  591 F.3d 116 (2d Cir. 2010) ...........................................................36

*Travelers Int'l, A.G. v. Trans World Airlines*,
  41 F.3d 1570 (2d Cir. 1994) ...........................................................36

*USA v. TD Bank, N.A.*
  Case 2:24-cr-00667-ES (DNJ) .........................................................11

*Villante v. Department of Corrections*,
  786 F.2d 516 (2d Cir. 1986) ...........................................................37

*W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008) ...........................................................28

*West v. Goodyear Tire & Rubber Co.*,
  167 F.3d 776 (2d Cir.1999) .............................................................51

*Whitney v. JetBlue Airways Corp.*,
  No. 07 CV 1397 (CBA), 2008 WL 2156324
  (E.D.N.Y. Apr. 29, 2008) ................................................................52

*Williams Paving Co. v. United States Fid. & Guar. Co.*,
    67 A.D.2d 827, 413 N.Y.S.2d 73 (4th Dept.1979) ............................................. 36

*Winthrop & Weinstine, P.A. v. Travelers Cas. & Sur. Co.*,
    187 F.3d 871 (8th Cir. 1999) ....................................................................... 29

*Zurich Am. Ins. Co. v. Wausau Bus. Ins. Co.*,
    No. 16-CV-3643 (VSB), 2018 U.S. Dist. LEXIS 168207,
    2018 WL 4684112 (S.D.N.Y., Sept. 28, 2018) ............................................ 28

**Statutes**

28 U.S.C. § 1291 ......................................................................................... 2

28 U.S.C. § 1332(a)(1) ................................................................................ 1

28 U.S.C. § 1441 .................................................................................... 1, 6

18 USCS § 1512 ........................................................................................ 53

Business Corporation Law §1006(a) .......................................................... 38

Business Corporation Law §1006(a)(4) ...................................................... 38

Judiciary Law § 489 .................................................................................... 36

**Rules**

Civil Practice Law & Rules § 5001 ............................................................ 50

Federal Rules of Appellate Procedure § 3 .................................................. 2

Federal Rules of Appellate Procedure § 4 .................................................. 2

Federal Rules of Civil Procedure § 9(a)(2) ................................................ 31

Federal Rules of Civil Procedure § 15 ................................................. *passim*

Federal Rules of Civil Procedure § 15(a) .................................................. 39

Federal Rules of Civil Procedure § 15(a)(2) .............................................. 38

Federal Rules of Civil Procedure § 17 ................................................. *passim*

Federal Rules of Civil Procedure § 17(a) .............................................. 39, 41

Federal Rules of Civil Procedure § 17(a)(1)(B) ....................................38

Federal Rules of Civil Procedure § 17(a)(3)...............................38, 42

Federal Rules of Civil Procedure § 21 ...................................1, 18, 38, 40

Federal Rules of Civil Procedure § 56.1 ...............................................4, 7

## Regulations

12 CFR § 21.2 .................................................................47, 48, 49

12 CFR § 21.3 ...............................................................................48

12 CFR § 21.3(a)(4)(b)(4).............................................................49

12 CFR § 21.3(a)(4)(b)(5).............................................................48

## Other Authorities

8 Am. Jur. 2d, Bailments, § 198 ...................................................26

8 C. J. S., Bailments, § 26 ............................................................26

9-47 Corbin on Contracts, § 47.7 .................................................26

Holmes, Common Law, p. 164 ......................................................26

## PRELIMINARY STATEMENT

Plaintiff-Appellant BAT LLC ("BAT") appeals from the Order Adopting Report and Recommendation of the U.S. District Court for the Eastern District of New York, entered September 26, 2024, which adopted the Report and Recommendation of the U.S. Magistrate Judge, dated March 30, 2024 (the "Report"), and the related Judgment entered September 27, 2024.[1] The Report recommended the dismissal of this action for lack of subject matter jurisdiction; the denial of BAT's motion for leave to file a Fifth Amended Complaint to add additional plaintiffs pursuant to Fed. R. Civ. P. 15, 17 and 21; and the denial of BAT's motion for summary judgment on its claims asserted against Defendant-Appellee TD Bank, N.A. ("TD"), and for spoliation sanctions against TD and Defendant-Appellee Halifax Security Inc. d/b/a North American Video ("Halifax").

## JURISDICTIONAL STATEMENT

**A.    District Court Subject Matter Jurisdiction**    The District Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1), diversity jurisdiction, as the action, when commenced by removal from NYS Supreme Court pursuant to 28 U.S.C. §1441, was between BAT, a citizen of New York, and TD

---

[1]    Because the District Court's Order fully adopted the Report (except with respect to the motions to preclude the experts, which the District Court deemed moot (A.10043)), this Brief will address the points addressed in the Report.

1

Bank, N.A., which is domiciled in Delaware and whose principal place of business is Florida. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. (A.663).

**B.    Court of Appeals Jurisdiction**    BAT's appeal is from the final judgment of the District Court pursuant to 28 U.S.C. §1291 and Rules 3 & 4 of the Federal Rules of Appellate Procedure. The District Court rendered its Order adopting the Report on September 26, 2024, (A.9867-9944), and Judgment was entered thereon on September 27, 2024. (A.10036-1044).

**C.    Filing Dates**    The appeal from the District Court's Order was filed timely by BAT on October 20, 2024. (A.10046-47).

**D.    Final Judgment**   The appeal is from a final judgment dismissing the action.

## STANDARD OF REVIEW

This Court reviews *de novo* the granting of summary judgment construing all inferences in favor of the non-moving party. *See Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir. 2013). This Court reviews denial of leave to file an amended complaint for abuse of discretion. *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 343 (2d Cir. 1999). The Court reviews *de novo* the denial of summary judgment to BAT. *Natale v. Ridgefield*, 927 F.2d 101, 104 (2d Cir. 1991).

## ISSUES FOR REVIEW

1.  Whether the District Court erred in granting defendants' motions for summary judgment based on the alleged invalidity of the assignments of claims to plaintiff, when the assignments' language encompassed all of the claims of the assignors, leaving no right of assignees to thereafter pursue their claims.

2.  Whether the District Court erred in granting summary judgment to defendants dismissing the action when, at most, the issues presented disputed questions of material fact.

3.  Whether the District Court erred in denying BAT leave to file an amended pleading.

4.  Whether the District Court erred in denying summary judgment to BAT.

5.  Whether the District Court erred in denying BAT's motion for spoliation sanctions against TD and Halifax.

## STATEMENT OF THE CASE

### A.    Nature of the Action

BAT commenced this action arising from a burglary on August 5, 2012, when unidentified burglars entered a TD branch in Brooklyn (the "Branch"), and accessed safe deposit boxes, including Box 198 (the "Box" or "Box 198") leased by Yaakov

and Chaya Bienenstock (the "Bienenstocks") from TD (the "Burglary").[2] (A.5378-79, TD 56.1 ¶1-6; A.5412, TD 56.1 ¶200-01; A.5421, TD 56.1 ¶231). The Box contained approximately $8 million in diamonds owned by Tappat, Inc. ("Tappat"), and cash, documents and cassette tapes owned by the Estate of Helen Sieger (the "Estate") (collectively, "the Contents"). (A.120, 162, 2056-83). The Contents were never returned, nor did defendants pay for the lost Contents. (A.5381, TD 56.1 ¶23). The presence of the Contents in the Box at the time of the Burglary is undisputed, as the Contents were independently inventoried and appraised more than one year before the Burglary. (A.2056-2083). The independent appraiser witnessed the Contents being returned into the Box and the Box being secured into the vault at the Branch. (A.5380, TD 56.1 ¶16). TD's own records confirm that no one else accessed the Box after the appraiser's inventory. (A.97, 5380-81, TD 56.1 ¶17). Thus, there was no challenge by defendants concerning the Contents.

The diamonds were certified by the Gemological Institute of America ("GIA") attesting to their authenticity. (A.2329-2402).

After the Burglary, the Bienenstocks, Tappat, and the Estate (the "Assignors") assigned all rights and claims to BAT. (A.100-105). BAT alleged, *inter alia*, that due to defendants' malfeasance, the burglars were able to break into the Branch and

---

[2]    Most material facts concerning the Burglary have been conceded to by TD in its internal documents (SA. 267-68, 323-25, 670-72, 1521-23, 1524), and in TD's response to BAT's Rule 56.1 Statement (A. 5377-5423) ("TD 56.1").

were able to remain at the Branch for 8 hours without interference from law enforcement, pilfering the safe deposit boxes, including Box 198. (SA. 267-68, 323-25, 1521-23, 1524). Law enforcement was not contacted by TD or defendant Lydia Monitoring Company Inc. d/b/a COPS Monitoring ("COPS"), TD's central station provider. (*Id.*) Several decisions by TD played a key role in that occurring. First, TD's prior alarm system had a wireless backup which had been removed, and its replacement did not contain a wireless/cell backup. (A.5393, TD 56.1 ¶96; SA.323-25, 670-72, 1521-23, 1524). This allowed the alarm to be compromised by a simple cutting of telephone and internet wires (the "Communication Lines"). (*Id.*) Second, TD failed to protect the Communication Lines, which were the sole means of communication between TD's new alarm system, COPS and the police. (*Id.*). Third, the alarm response protocol set up by TD, COPS and defendant Integrated Security Systems ("ISS"), was to withhold any reporting to the police, and for TD and COPS to take any action, in the event that Communication Lines were disabled. (*Id.*)

BAT's claims against TD and the other defendants included gross negligence for the implementation and maintenance of the deficient alarm system and alleged breach of the bailment contract. The parties filed respective motions for summary judgment, with TD and the other defendants contending that the claims should be dismissed because the assignments to BAT were invalid, and, therefore, the court

lacked subject matter jurisdiction. Other contentions were not reached by the District Court.

## B.    Course of the Proceedings

This action originated in NYS Supreme Court. (A.64-73). On October 9, 2015, TD removed the action to the District Court pursuant to 28 U.S.C. §1441. When BAT commenced the action, BAT first identified TD's prior alarm company as a defendant. Thereafter, despite court orders to identify the proper alarm vendors, TD incorrectly identified its alarm vendors on multiple occasions (A.58-60), resulting in the complaint being amended four times within the first 10 months of the action. The Fourth Amended Complaint was filed on September 15, 2016. (A.659-669). The parties proceeded with discovery, and depositions commenced in April 2017, including examinations of Abraham Sieger and Chana Brachfeld on behalf of BAT, Tappat, and the Estate; the Bienenstocks; and of Meyer Greisman ("Greisman"), the father/father-in-law of the Bienenstocks. (A.106, 542). Depositions of defendants and non-parties identified by defendants lasted for years and, as noted in the Report, the action was fraught with many discovery disputes, including those relating to TD misidentifying its security personnel and their relevant knowledge. The parties also engaged in expert discovery on the subject of alarm security and regarding the valuation of the Contents.

In August 2022, BAT and all defendants filed pre-motion letters for, *inter alia*, summary judgment, at which point Rule 56.1 Statements of Undisputed Fact were simultaneously filed as per the District Judge's rules. (A.1673-3110, 3338-3813, 7762-66, 7852-8373; SA.460-489). The parties were all granted permission to make the requested motions. BAT also moved for leave to file a Fifth Amended Complaint to address standing issues raised for the first time by defendants in their pre-motion letters and motions. (A.9584).

## C. The Disposition Below

On March 30, 2024, Magistrate Judge Pollak, rendered her Report on all pending motions. The Report recommended dismissal of the action, and denied BAT's motions to amend the complaint, and for summary judgment against TD. The Report also recommended that the parties' motions to preclude experts, BAT's motion for spoliation sanctions, and the motion of ISS for sanctions, be denied. (A.9867-9944). On September 26, 2024, by Order Adopting Report and Recommendation, U.S. District Judge Nina R. Morrison, adopted the Report in full but deemed the motions to preclude the experts as moot. (A.10036-44).

## STATEMENT OF FACTS

### TD's Branch

In 2003, Commerce Bank opened the Branch. At that time, Commerce retained Gilbertson Group to install and program a Bosch security system (the

"Bosch System") at the Branch. (A.576-77; SA.979-980). The Bosch System contained an analog wireless backup transmitter (the "Bosch Wireless Backup") (A. 5393, TD 56.1 ¶96; SA.224-225, 267, 1526). The system had constant 24-hour central station monitoring. (A. 5393, TD 56.1 ¶98). The Bosch System was able to connect with the Central Station using telephone lines and the Bosch Wireless Backup. (SA.904-905,1526-27). Commerce Bank also installed a video recording system with at least 16 video cameras, which constantly recorded (24/7) in the Branch (the "Video System"). (SA.1095). The Gilbertson Group prepared a security drawing of the Bosch System and Video System which was not updated prior to the Burglary. (A.5671; SA.1046-47).

In 2008, TD merged with Commerce Bank and operated the Branch under the TD Bank name. (A.5384, TD 56.1 ¶40). Pursuant to its lease for the Branch, TD assumed responsibility for all utilities, including the Communications Lines. (SA.465; A.8000).

In 2008-2009 (TD claims to be unaware of the year), TD decided that the Bosch System should be replaced (SA.418). TD's employee, John Minster ("Minster"), made all material decisions concerning the replacement of the Bosch System. (*Id.*; A.5395-96, TD 56.1 ¶¶113-14).

Minster was hired in 2004 by Commerce Bank as a technical analyst without any prior bank security experience. Minster had no college education, schooling or

training regarding the design, selection, installation and maintenance of bank security systems; he had no schooling or training with regard to central stations systems; and he had no schooling or training with regard to communications systems and the Communications Lines. (SA.918-922).

Minster elected to replace the Bosch System and its Bosch Wireless Backup with a DMP Alarm System (the "New Alarm System") without a cellular or wireless backup (the "DMP Cell Backup") (SA.323-25;1521-23), despite its inclusion in an equipment list contained in TD's contract with its security contractor. That contract provided that the DMP Cell Backup could be purchased for each branch at a price of $215.02 (A.3749, 5406, TD 56.1 ¶167) plus installation and labor cost which would equal $1,032.14 when installed. (A.5406, TD 56.1 ¶168; A.8223).

TD's security system did not contain an audible sound alarm. (SA.1446).

Box 198

In 2006, Abraham Sieger and Chana Brachfeld ("Sieger&Brachfeld"), the only children of Helen Sieger and persons of financial means, sought to make a significant investment. (A.131;153). After discussing with their mother, Sieger&Brachfeld decided to invest $8 million in the purchase of diamonds. (A.209-10). Helen Sieger assisted her children in the logistics of the investment. (A.122-23;4322). Sieger&Brachfeld made the investment through Tappat, a New York corporation. (A.120). At all times, Sieger&Brachfeld each owned 50% of Tappat.

9

(*Id.*) Helen Sieger was never an owner or shareholder of Tappat; there is no document or testimony that states otherwise.

To assist her children, Helen Sieger opened a bank account for Tappat, just as would any officer of a company. Helen Sieger did not claim to be the shareholder of Tappat. Helen was designated as the president of Tappat as agreed with her children, to assist in the procurement of the diamonds and its management. *See* Tappat Bank documents. (A.2277; 4322).

Helen Sieger arranged for Tappat to purchase the diamonds. After the purchase, Helen Sieger displayed the diamonds and their purchase invoices to her children. (A.184; 2116-17). The diamonds were all GIA certified diamonds with recorded certificates attesting to their authenticity. (A.2329-2402). In the nearly 20 years since the diamonds were purchased, only Tappat and its assignee BAT ever alleged any ownership in the diamonds.

In May 2010, Helen Sieger became concerned that the person holding the diamonds was not reliable. (A.1974). She requested that a long-term business associate, Griesman, and his family, the Bienenstocks, hold the Contents. (A.1875). The Bienenstocks agreed, and on June 10, 2010, the Bienenstocks leased Box 198 at the Branch and later placed the Contents into Box 198. (A.329, 442). The Bienenstocks were the lessees of Box 198 at all relevant times and they had a bailee/bailor relationship with TD. (A.329-31, 437-38, 5379). Greisman and the

Bienenstocks were not aware of who owned the Contents and Helen Sieger never discussed the ownership of the Box's contents with them. (A.343, 349-51, 368, 387, 394, 462-63, 1911, 2005). The Bienenstocks were never advised by TD that they were not permitted to place other persons' property into the Box, nor does TD have a policy to that effect. (SA.1334-35).

The Bienenstocks believed TD had a reliable alarm system and that the companies that serviced the alarm system provided a reliable and fully secure alarm system as would be expected from a bank. (A.8949).

In April 2011, Helen Sieger died. Contrary to TD's slanderous accusations, Helen Sieger was never convicted of any crime and her Estate has no outstanding debts or claims against it.[3] Although the court spent pages discussing Helen Sieger, there was no reason to do so because inadmissible allegations and inuendo concerning Helen Sieger have no impact on this action. For example, much ado is made that on August 26, 2010, $5 million of Helen Sieger's assets were restrained by a Bronx Supreme Court Order (the "Restraint Order"), arising from her nursing home activities which have been since resolved. (A.1711-1717). Only $5 million

---

[3] TD, on the other hand, has a long history of illegal activity and violation of the United States banking laws, including failure to train and supervise employees. On October 10, 2024, TD pleaded guilty to criminal charges. *See USA v. TD Bank, N.A.* Case 2:24-cr-00667-ES (DNJ); *see also In re: TD Bank, N.A. and TD Bank USA, N.A.,* USA Fin.Cen. No. 2024-02 (imposing a more than $2 billion penalty on TD for Banking Law violations). TD's admitted wrongdoing and criminal conviction is eerily similar to this case in that TD repeatedly violated Banking Laws over many years and failed to have officers and employees properly trained.

of Helen Sieger's and certain listed entities' assets were restrained. (*Id*). The Restraint Order has no material relevance to this case and the Burglary, which occurred over one year after her death. TD presented no evidence that Helen Sieger failed to comply with the Restraint Order.

Moreover, Box 198 was never affected by the Restraint Order. First, the Restraint Order was filed on August 26, 2010 *after* the Contents were placed in the Box. The Restraint Order was not a turnover order and, therefore, *at most*, all that was required was for the Contents to remain in the Box. (A.1711-1717). It is undisputed that the Contents remained in the Box until well after Helen Sieger's death. Thus, there could not have been any violation of the Restraint Order.

Second, Tappat (the owner of the diamonds) was *never* the subject of the Restraint Order. Tappat was excluded from the Restraint Order. (*Id*.)

The Appraisal

In June 2011, the Bienenstocks' counsel arranged for an inventory of the Box's Contents and its preliminary evaluation. (A.1942). Donald A. Palmieri ("Palmieri"), a highly accredited appraiser and former President of the Gemological Appraisal Association, publisher of Palmieri's Market Monitor, and Founder and President of GCAL, an ISO accredited laboratory, was hired to conduct the inventory and preliminary evaluation, which was performed on June 23, 2011 (A.2056-83). Yaakov Bienenstock opened the Box for Palmieri in his presence, and Palmieri

examined and photographed the Contents. (A.5380-81, TD 56.1 ¶¶12-13, 16-17; A.7927-7940). After completing the inventory, Palmieri witnessed all of the Contents being returned to the Box and the closing of the Box. (*Id.*). The Box was not accessed after Palmieri's June 23, 2011 examination until the Burglary. (*Id.*). The Bienenstocks continued to lease and pay for Box 198. (*Id.*).

<u>The Burglary</u>

On the evening of Sunday, August 5, 2012, unidentified burglars entered and broke into many safe deposit boxes at the Branch, including Box 198. (A. 5412, TD 56.1 ¶¶200-201; SA.323-25;1521-24). The Branch had several unprotected entrances (SA.671-73) and the precise method of the burglars' entry is unknown. (A.5412, TD 56.1 ¶200). At some point, the burglars entered the basement. The basement was not protected by the New Alarm System, nor was it properly secured. (A.5412, TD 56.1 ¶203). Access was freely available to all tenants in the building and to others. (A.5389, TD 56.1 ¶¶57, 68, 69, 70; SA.672). After the Burglars entered the basement, they cut the Communication Lines, which were contained in a single unprotected conduit. (A.5412, TD 56.1 ¶¶203, 204; SA.528-29). Cutting the Communication lines neutralized the New Alarm System's capability to contact COPS and the police. (SA.458-59; 1521-24; SA.830-31).

Soon after, the New Alarm System issued the following signal: "8:45PM Warning: Telephone Line 1 Trouble" Alarm panel "8:45PM Warning: Telephone

Line 1 Trouble" (A.5414, TD 56.1 ¶213; SA.459;1529). The New Alarm System issued other signals indicating that the Burglary was in progress (A.5416, TD 56.1 ¶222), but these signals were not received by COPS, nor by the police, because the Communications Lines were cut and no DMP Backup had been installed. (SA.1529-1532).

TD and COPS did receive signals indicating that something was awry at the Branch notwithstanding the cut Communications Lines, but the response protocol was set to have these signals ignored. (A.1460-67; SA.904;1522). On August 5, 2012 at 8:46PM, TD's Network Operations Center ("NOC") received a direct email message: "8:46PM Warning: Network/Communication Path Trbl." (A.5414, TD 56.1 ¶214; SA.459;1460;1521-28;1551). NOC ignored the notice and TD claimed that it did not have any procedures in place to take any action. (SA.1521-28). Similarly, at 10:22pm, COPS received a signal indicating a communication outage, but COPS just automatedly logged this signal into its computer system and took no action. (SA.1526;1551).

The burglars remained at the Branch for approximately 8 hours. (SA.1521-24; A.903). Many safe deposit boxes were forcibly opened. At the time of the Burglary, the Box contained approximately $8 million in diamonds, cash, documents and cassette tapes. TD neither returned the Box's Contents nor paid for their loss. (A.5381, TD 56.1 ¶23).

Assignments to BAT

The Bienenstocks submitted their claim to TD's designated claims manager pursuant to TD's instructions. (A.5403, TD 56.1 ¶156, A.8938). However, TD did not return the Box's Contents nor pay its value. (A.5381, TD 56.1 ¶23). Given the Burglary and the potential loss of $8 million, the Bienenstocks were concerned that they would be liable to the Contents' owners. The Bienenstocks sought assurances that they would not be sued. (A.366-67). The Contents' owners, Tappat and the Estate (the "Owners"), sought to have the Bienenstocks assign all of the Bienenstocks' rights, claims and ownership to the Box and its Contents (i.e., everything related to the Box and its Contents, including the lease contract with TD [the "Lease"]) to the Owners' designee. Additionally, the Owners wanted to consolidate under Sieger&Brachfeld's auspices all potential rights, claims and ownership interests with respect to the Box and Contents because Sieger&Brachfeld were: (i) the sole shareholders of Tappat, the owner of the diamonds and their receipts and documentation; and (ii) the sole beneficiaries and court appointed co-administrators of the Estate, which owned the cash, documents and recordings. (A.5382, TD 56.1 ¶28).[4]

---

[4]    Thus, through the Owners, Sieger&Brachfeld owned and controlled all claims concerning the Box and Contents, even without any assignments (A.4323-4324).

Accordingly, BAT was formed by Tappat (99%) and Abraham Sieger on behalf of the Estate (1%) (A.75-92), and all parties executed the assignments to BAT: the Bienenstocks assigned all of their rights, claims and interests in the Box to BAT, and the Owners assigned all of their rights, claims and interests in the Box and Contents to BAT, the entity that they owned. Abraham Sieger was authorized to execute the assignment on behalf of Tappat, by Sieger&Brachfeld, the sole shareholders and officers. (A.100-105). Sieger&Brachfeld were authorized to execute the assignment on behalf of the Estate as court appointed co-administrators. (A.927). The assignments by the Bienenstocks, Tappat and the Estate (collectively the "Assignments") were intended to encompass, and did encompass, anything and everything that the Assignors owned, or had rights to, concerning the Box and Contents. (A.100-105). All of the Assignors' claims, rights and ownership concerning the Box and Contents were consolidated into Tappat's and the Estate's subsidiary, BAT, through the Assignments.

The Spoliation

After the Burglary, TD and the other defendants failed to preserve the New Alarm System's panel (the "New Alarm Panel"), its components and the Communications Lines, thereby depriving BAT's alarm experts from reviewing the functionality of the system during and prior to the Burglary. Despite knowing the importance of these items and relevance to inevitable litigation, TD destroyed the

16

New Alarm Panel, its components and Communications Lines. Throughout discovery, TD and the other defendants claimed that they do not possess any documents concerning the installation, purchase or maintenance of the New Alarm System. (A.5401-02, TD 56.1 ¶¶147, 148, 150, A.8231; *see also* A.566).

The New Alarm Panel, its components and Communications Lines could likely have shown that they were defective or installed defectively and that for three years defendants knew that they were defective. Moreover, critical information of the operations of the New Alarm System is contained in the New Alarm Panel's chips and memory, which were destroyed by TD, thereby prejudicing BAT.

TD also spoliated video recordings of the Burglary. There were at least 16 video cameras that continuously recorded. (SA.116-117, 280,1093-1095; A.9440). TD, however, claimed to have only retained a short 12-minute video clip from within the vault. (A.9023).

The video recordings are very significant because they would disprove TD's and its expert's speculative claim that the burglars stayed exclusively in the vault, and would not have been seen by law enforcement through the large windows of the Branch if a proper alarm system and response protocol had been in place. This claim by TD was belied by evidence showing a second hole cut in the ceiling above an area outside the vault. (A.5413, TD 56.1 ¶¶205, 206, 207, 208, 209; SA.744-745; 1524). This second hole gave the burglars access to the entire area of the Branch

outside the vault and they would have been visible had law enforcement been dispatched by the alarm system. Because TD destroyed the video recordings, it could not be determined when the burglars entered the main Branch area through the second hole. TD benefitted by its destruction of the video recordings.

## SUMMARY OF ARGUMENT

The main reason for the Report's recommended dismissal of this case is its conclusion that the Assignments to BAT did not assign to BAT all of the Assignors' interests in the Box and Contents, which resulted in the dismissal of the action for lack of subject matter jurisdiction. The court's holding, however, is contrary to established principles of law regarding the validity of assignments. The language of the Assignments was clearly sufficient as a matter of law to effect the assignment of the parties' claims to BAT. The court's narrow construction of the Assignments is contrary to their plain meaning and the law regarding interpretation of assignments. Whether federal or state law is applied, assignments are to be interpreted to give voice to the intention of the parties making the assignments. The court ignored this basic premise.

In addition, the court should have granted BAT's motion for leave to file a Fifth Amended Complaint pursuant to Fed. R. Civ. P. 15, 17 and 21. Nothing of substance is changed from the prior pleading, except to add as additional plaintiffs the Assignors. All proposed additional plaintiffs had already been deposed and,

consistent with the holdings in other cases, the amendment should be allowed following the court's ruling on the standing of the original plaintiff. There is no prejudice in light of all the proceedings in the case which establish the record evidence. Contrary to the court's suggestion, no additional discovery is necessary.[5]

Finally, the court should have granted summary judgment to BAT. The Record establishes liability and damages on the part of TD. In addition, the court should have assessed sanctions against TD and Halifax because of their spoliation of critical evidence.

---

[5] The court also should have disqualified defendants' experts because defendants' experts have no expertise in bank alarm systems or the proper duty of care, they had no evidentiary basis to opine that the New Alarm System and its components were operational, and they relied on rank speculation. TD's valuation expert should have been disqualified because his opinion is contrary to the law as to the proper measure of damages, and was based on unsupported speculation and other claims not supported by admissible evidence.

## POINT I

## SUMMARY JUDGMENT SHOULD HAVE
## BEEN DENIED TO DEFENDANTS

On a motion for summary judgment, the movant has the burden of establishing by admissible evidence the absence of a genuine issue concerning any material fact. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 78 (2d Cir. 2002). Summary judgment is only appropriate when the record could not lead a rational trier of fact to find for the non-moving party. *Matsuchita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The trial court's function is not to weigh the evidence or resolve the issues of fact, rather its role is to decide whether, after drawing all inferences in favor of the non-moving party, a trier of fact could find in favor of that party. *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

Defendants' motions for summary judgment, as adopted by the court, were fraught with inadmissible innuendo and derogatory references to the deceased Helen Sieger, who died more than a year before the Burglary, and who was never convicted of a crime. The court also drew all inferences against Abraham Sieger without cause or justification. What resulted was the court drawing all inferences in favor of the moving parties, defendants, instead of BAT.

Defendants' motions were granted based on TD's claim that BAT's assignments do not confer standing on BAT. But that erroneous conclusion was

reached only after considering TD's disparaging assertions as admissible evidence, which they were not. There was no admissible evidence that the Contents were "contraband." On the contrary, each of the diamonds in the Box was GIA certified and their certifications were provided to TD directly from GIA. (A.2329-2402). In nearly 20 years since the diamonds were purchased, no one besides BAT and its 99% member ever alleged any ownership in the diamonds.

Another inadmissible contention by defendants and adopted by the court is the false claim that Palmieri, who inspected the Contents and appraised the diamonds, was "instructed" that the value of the diamonds could not exceed $3 million, or would "trigger additional legal disposition." First, Palmieri's appraisal provides a $7.5 million valuation, thus belying this assertion. Second, the Palmieri appraisal does not state that Abraham Sieger had any conversations with Palmieri, nor does the appraisal state that Palmieri was so instructed. On the contrary, both Palmieri and Abraham Sieger testified that they never communicated with each other. (A.186-187, 2565) "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine*, 85 F.3d 1002, 1011 (2d Cir. 1996).

## POINT II

## <u>THE ASSIGNMENTS CONFER STANDING</u>

The main reason for the District Court's dismissal of the action is its conclusion that the Assignments did not adequately convey to BAT ownership rights in the Box and Contents. As we show below, that holding is contrary to established principles of law.

### A. The Assignments Are Valid

The Assignments are valid pursuant to *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,* 554 U.S. 269, 285, 128 S. Ct. 2531 (2008). In *Sprint*, payphone operators who were owed payments from telephone carriers, assigned their right to collect the payments to collection firms known as "aggregators." *Id.* at 271–72. The assignments stated that they "assigned, transferred and set over to [the aggregator] for purposes of collection, *all rights, title and interest* of the [payphone operators] in [the operators'] *claims, demands, or causes of action.*" *Id.* at 272, 128 S.Ct. 2531 (internal quotations omitted). The telephone carriers moved to dismiss the action, claiming that despite the assignments, the aggregators lacked standing to sue the telephone carriers. The Supreme Court held that the aggregators' standing was consistent with the "historical tradition of suits by assignees, including assignees for collection." *Id.* at 285. The Court reviewed the language of the assignments and held that an assignment "for purposes of collection, all rights, title and interest of the

22

[payphone operators] in [the operators'] claims, demands, or causes of action" provided the aggregator with standing to bring the action. *Id.* at 272.

Each of the Assignments has language that is no worse than in *Sprint*. The assignment by the payphone operators in *Sprint* did not require a statement as to how they came to possess their claims—but that appears to be what the District Court held in our case, when it criticized the assignments for not expressly conveying the safe deposit lease although it could not be questioned that the Assignments assigned *all* interests in the Box, Contents and claims against TD and other defendants. Therefore, the Court erred in holding that BAT has no Article III and prudential standing.

The principles governing assignments espoused by the Court in *Sprint* were ignored by the Court. A chose in action may be assigned, which is part of what was assigned to BAT. *Id.* at 284, citing to *Titus v. Wallick*, 306 U.S. 282, 59 S. Ct. 557 (1939) (applying New York law). Moreover, the Court stated "that courts long found ways to allow assignees to bring suit . . . ." *Id.* The Court was primarily concerned that "concrete adverseness" exists, that the assignee possesses a personal stake in the case; i.e., that the plaintiff would be asserting its own rights and not the legal rights of others. *Id.* at 288-290. "Concrete adverseness" certainly existed in this case. BAT, just like the assignees in *Sprint,* was asserting legal rights of its own.

BAT clearly possessed "constitutional minimum of standing," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), because BAT demonstrated (1) it sustained an injury that was concrete—the loss of more than $7 million of the Contents, (2) the injury was "fairly traceable" to the defendants' actions, and (3) the likelihood that the injury would be addressed by a judicial determination in BAT's favor. *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (citing *Lujan*, 504 U.S. at 560-61).

## B.    The Bienenstock Assignment Confers Standing

The court erroneously held that the Bienenstock assignment failed to assign ownership to BAT of the Contents because the assignment language supposedly did not transfer "the particular subject of assignment," citing *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir. 1997) (quoting *Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.*, 10 A.D.2d 372, 376, 199 N.Y.S.2d 852, 855 (4th Dep't 1960)). In stark contrast to the assignment in *Advanced Magnetics*, however, the language of the Bienenstock assignment cannot be characterized as not including the subject matter of the assignment. It provides plainly:

> ASSIGNORS are the owners of certain claims against TD Bank, N.A. [and others]. . . for any claims related in any manner to the TD Bank, N.A. box (the "Box") which was rented by Assignors . . . . ASSIGNORS hereby assign to ASSIGNEE all of the rights of ASSIGNORS as to (i) their ownership rights or any other rights whatsoever

24

> concerning any items previously contained in the Box; and
> (ii) the Claims whether or not previously asserted by
> ASSIGNORS.

(A.100-105).

As in *Sprint* all rights and claims were assigned. Nothing is missing from this language.

Each of the reasons set forth in the Report for invalidating the Bienenstocks' assignment was erroneous.

First, the court held that the assignment does not mention title to, or ownership of the claims. Report at 30. It certainly does, and as a bailor under New York law, the Bienenstocks' rights were concrete and assignable. That the Bienenstocks were the bailors of the Box and Contents is not disputed. Nor was it disputed that TD had the duties of a bailee. *Sichel v. Central Fed. Sav. & Loan Assn.*, 143 Misc.2d 42, 43 (N.Y. Sup. Ct. 1989) ("[t]he law in this jurisdiction is that when a bank rents a safe-deposit box to a customer, the parties have entered into a bailor/bailee relationship.") As lessees of the Box, the Bienenstocks had standing to bring this action for damages arising from the Box and the loss of its Contents. *See Grace v. Sterling, Grace & Co.,* 30 A.D.2d 61, 65-66, (1st Dep't 1968); *Berger v. 34th St. Garage,* 274 A.D. 414 (1st Dep't 1948).

> The contractual relationship creates the pledgee's right to
> possession of the collateral but his responsibilities under
> the law arise from his taking and maintaining such
> possession." While the relationship so created is basic, the

25

legal duty is not a matter of contract; rather it is imposed by law." (<u>8 Am. Jur. 2d, Bailments, § 198, p. 1084</u>. See, also, <u>8 C. J. S., Bailments, § 26</u>.)

\*　　　　\*　　　　\*

<u>The</u> owner and original bailor, although not entitled to possession, may sue the third party who received the goods from the owner's bailee and who has negligently or tortiously injured, lost or converted the same. (*Berger v. 34th St. Garage*, 274 App. Div. 414, 417, citing Holmes, Common Law, p. 164 et. seq.)

*Grace*, 30 A.D.2d at 65.

Under New York law, "contracts are freely assignable absent language which expressly prohibits assignment . . . ." *In re Stralem*, 303 A.D.2d 120,122, 758 N.Y.S.2d 345, 347 (2d Dep't 2003) (holding that assignment of mortgage automatically effects assignment of the underlying note) (citing *Allhusen v. Caristo Constr. Corp.*, 303 N.Y. 446 (1952)). "No particular words are necessary to effect an assignment; it is only required that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned." *Leon v. Martinez*, 84 N.Y.2d 83, 88, 614 N.Y.S.2d 972 (1994). *See Deutsche Bank Natl. Trust Co. v. Romano*, 147 A.D.3d 1021, 1023, 48 N.Y.S.3d 237, 240 (2d Dep't 2017) ("there are no prescribed formalities that must be observed to make an effective assignment. It is sufficient if the assignor has, in some fashion, manifested an intention to make a present transfer of his rights to the assignee") (quoting 9-47 *Corbin on Contracts* § 47.7; emphasis omitted).

26

This is the critical factor: for the assignment to be valid the assignor must be "divested of all control over the thing assigned." *Coastal Commercial Corp.,* 10 A.D.2d at 376. It cannot be genuinely disputed that the Bienenstock assignment placed all control, ownership and interest in the claims against defendants regarding the Box and Contents in the possession of BAT only. The Bienenstocks no longer had such rights and interests. They could not sue TD—only BAT could.

This point is what distinguishes the assignment language in the case on which the court relied, *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411 (2d Cir. 2015), from ours. In our case, after the assignment, the Bienenstocks had no further rights or interests in the claims that had been assigned. They had no more right to sue; only BAT could. In *Cortlandt*, by contrast, the assignment was not complete, leaving certain rights in the assigned subject with the assignor. The assignment was in reality a glorified "power of attorney." As held in *Cortlandt*, the power to commence an action and prosecute it to conclusion does not validly assign a claim; it is merely a power of attorney. 790 F.3d at 418. The plaintiff was only authorized to collect payment, but did not transfer title to the claims sought to be transferred. *Id.* at 419. That description cannot be ascribed to the Bienenstock assignment.

This key distinction—that the assignment in *Cortlandt,* as opposed to the Bienenstock assignment, left the assignor with ownership rights to the claims being

assigned–was noted by subsequent courts. *See Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 0793 (PAC), 2021 U.S. Dist. LEXIS 136005, *4-5, 2021 WL 311549 (S.D.N.Y., July 21, 2021) ("In *Huff* and *Cortlandt* . . . the purported assignment agreements at issue there were construed to only confer a power of attorney, not a transfer of ownership, over the relevant cause of action. . . . In *W.R. Huff*, for example, the court noted that the plaintiff was given the authority 'to make some decisions concerning litigation' but that it did 'not have an ownership stake in any claims its clients might pursue against defendants.'" (quoting *W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008)); *NCUA Bd. V. HSBC Bank US, N.A.*, 331 F.R.D. 63, 72 (S.D.N.Y. 2019) (distinguishing *Cortlandt* as not assigning complete ownership of the claims); *Zurich Am. Ins. Co. v. Wausau Bus. Ins. Co.*, No. 16-CV-3643 (VSB), 2018 U.S. Dist. LEXIS 168207, at *16-17, 2018 WL 4684112 (S.D.N.Y., Sept. 28, 2018) (holding that assignment language in *Cortlandt* merely gave a power of attorney).

A second and related reason for the court invalidating the Bienenstock assignment is that the assignment supposedly did not convey the Lease. As noted in *Grace*, 30 A.D.2d at 65, the Lease does not create the Bienenstocks' claims and rights. It is bestowed upon the Bienenstocks as a matter of bailee/bailor law. *See Eitzen Chem. A/S v. Carib Petroleum*, case no. 10-Civ.-2351, 2016 U.S. Dist. LEXIS 180304, 2016 WL 7486017 (S.D. Fl., Dec. 29, 2016) (Rule 17 permits bailees to sue

in their own names); *Advanced Magnetics, Inc.*, 106 F.3d at 17 ("In general, claims or choses in action may be freely transferred or assigned to others).

Moreover, the assignment could not be more clear that it does assign all of the Bienenstocks' rights including the Lease. The assignment includes "any claims related in any manner to the TD Bank, N.A. Box (the "Box") which was rented by Assignors," and Assignors "assign[ed] to ASSIGNEE all of the rights of ASSIGNORS as to (i) their ownership rights or any other rights whatsoever concerning any items previously contained in the Box; and (ii) the Claims whether or not previously asserted by ASSIGNORS." The assignment did not have to specify every piece of paper and anything and everything to do with the Box. Such requirements are contrary to New York law. Such detailed assignments are not required under *any* application of contract law. *See, e.g., Optimal Strategic U.S. Equity Ltd. v. SPV OSUS Ltd.*, 54 Misc. 3d 1223(A), 55 N.Y.S.3d 693 (Sup. Ct., N.Y. Co., 2017) (under New York law, no specific language is required to transfer tort claims; "words are sufficient which show an intention of transferring such rights"); *Winthrop & Weinstine, P.A. v. Travelers Cas. & Sur. Co.*, 187 F.3d 871, 875 (8th Cir. 1999) ("The plain language of the assignment refers to 'all claims and rights' growing out of the employment theft, and courts have interpreted such language in assignments and releases broadly"); *Sutton v. Shasta Indus.*, No. CV-20-02320-PHX-SMB, 2021 U.S. Dist. LEXIS 158177, at *8-9, 2021 WL 3709853

(D. AZ, Aug. 20, 2021) ("magic words" of assignment are not necessary; under Arizona law, "courts should seek 'to discover and effectuate the parties' expressed intent'") (citations omitted)); *Metro. Surgical Inst., LLC v. Cigna*, No. 19-15827 (MAS)(LHG), 2020 U.S. Dist. LEXIS 136605, at *12, 2020 WL 4432430 (D.N.J., July 31, 2020) (broad language of assignment); *In re Air New Orleans, Inc.,* No. 04-3241, 2005 U.S. Dist. LEXIS 17754, at *15, 2005 WL 2036678 (E.D. La., Aug. 12, 2005) (claims were included in "overly broad language of the Assignment Agreement"). The court wrongfully added a new requirement—that of specificity—in assignment language under New York law.

At the very least, since there are questions of fact regarding the scope of the assignments, summary judgment should have been denied.[6]

## C.     The Assignments from the Owners Confer Standing

As discussed above, pursuant to *Grace* and other New York cases, the Owners have standing to bring a direct claim against defendants. The Owners were freely permitted to assign their claims and rights to BAT. They controlled both the assignor and assignee.

---

[6] To clarify the intent underlying the assignment from Bienenstock, BAT submitted later versions of assignments which clarified the nature of the assignment. (A.4326-4330). The Report erroneously viewed this as a new assignment that would not relate back to the initial filing of the summons, citing *Nomura Asset Acceptance Corp. Alternative Loan Trust v. Nomura Credit & Capital, Inc.*, 139 A.D.3d 519, 520, 31 N.Y.S.3d 863 (1st Dep't 2016) (Report at 30 n.41). *Nomura*, however, did not involve the validity of an assignment.

The court held that the assignments from the Owners failed for the same reason as the Bienenstock assignment. As we show above, the assignments are broad enough to include the total assignment of all claims and rights regarding the Box and Contents.

The other grounds for invalidating the Owners' assignments are equally erroneous. The court's reliance on Fed. R. Civ. P. 9(a)(2), is misplaced. Paragraph 2 of the Fourth Amended Complaint pleads that BAT was the Bienenstocks' assignee, therefore, BAT is not required to allege *additional* means of jurisdiction or capacity to sue. *See Lang v. Tex. & Pac. Ry. Co.*, 624 F.2d 1275 (5th Cir. 1980) (plaintiff need not allege capacity to sue beyond establishing subject matter jurisdiction); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 540 (D.N.J. 2004) (validity of assignment need not be pled by a plaintiff). Tappat and the Estate -- as owners of the Contents -- have prudential and Article III standing to commence an action against defendants.

The Report's factual conclusion that TD was not aware of the Owners' assignments is belied by the Record. Report at 34. Prior to July 2017, all Assignments had been provided to TD (A.5383, TD 56.1 ¶32), and TD's counsel used all Assignments as exhibits during Abraham Sieger's deposition. (A.160,168). The Assignments were also submitted to the court on October 26, 2017. (A.100-105).

31

The clarifying assignments produced in 2022 in response to TD's pre-motion letter were exactly that: a clarification that the Owners had assigned all of their interests in connection with the claims and assets. It was not a "new" assignment.

The Report noted "additional issues regarding the Estate assignment," but "did not reach these additional issues." Report at 36. Essentially, the court raised as a question of fact whether Sieger&Brachfeld were the sole beneficiaries of the Estate and whether the administrators could collect on claims exceeding $3 million, but TD had conceded that Sieger&Brachfeld were the Estate's only beneficiaries. (A.5382, TD 56.1 ¶29). Sieger&Brachfeld were the only children of Helen Sieger, who died intestate. There is no basis to question whether they were the only heirs; no evidence was ever submitted to the contrary (and there is none). As for the $3 million administration limitation which was increased by the New York Surrogate's Court to over $9 million (A.4318), TD lacks standing to allege any purported court order violations (of which there were none), as they are not a party with an interest in the Estate. In addition, there was no admissible evidence that the Estate owned the diamonds in the Box. Tappat owned the diamonds and it expressly states so in the Tappat assignment. Nor was there any admissible evidence that the Estate owned Tappat. It did not. The unrebutted evidence in this case is that the sole shareholders

of Tappat are Sieger&Brachfeld.[7]  (A.120).  Moreover, there is no evidence that the value of the claim assigned to BAT, and its *right to assert its claim and litigate such claim* against defendants, exceeds $3 million.  It is axiomatic that the value of the right to sue on a *claim* is far less than the damages sought.  According to defendants, BAT's claim has no value at all.  Additionally, assigning the rights to claims is not the same as "collecting and administering" the Estate—which is the limitation language in the Letters of Administration.  Therefore, the Kings County Surrogate's Order did not preclude the assignment.

Regarding the assignment from Tappat, the court's conclusions should be rejected.  First, the court sought to invalidate the Tappat assignment because Tappat was dissolved at the time of the assignment.  Report at 37.  Tappat, however, still had a legal existence because "New York courts long ago rejected" the rule "that causes of action in favor of or against a corporation abated upon dissolution ....[A] corporation continues to exist as a legal entity after dissolution in New York, at least for the purposes of actions and proceedings."  *Independent Investor Protective League v. Time, Inc.*, 50 N.Y.2d 259, 262-263, 428 N.Y.S.2d 671, 673 (1980).  And

---

[7]   No admissible evidence supported the court's finding that Sieger&Brachfeld lacked authority to act for Tappat.  Nor was there any admissible evidence that Tappat was really owned by Helen Sieger.  In any event, at the time of the assignment, Sieger&Brachfeld had the authority to act for Tappat: either they owned Tappat directly as its sole shareholders, or assuming *arguendo* that Helen Sieger had owned Tappat prior to her passing (which she did not), then, upon her death, Sieger&Brachfeld possessed the authority to act for Tappat as the co-administrators of the Estate.

if Tappat were deemed to have no authority to sue, their sole shareholders, Sieger&Brachfeld, certainly could.

Second, the court held that no evidence was presented showing that Abraham Sieger was an authorized representative of Tappat who could assign Tappat's interests to BAT. Report at 38. But Abraham Sieger submitted a sworn Declaration that he had that authority. (A.4322). Under New York law, that is sufficient to establish ownership.[8] *See SPA Steel Prods., Inc. v. Pizzeria*, 172 A.D.2d 1002, 1003, 568 N.Y.S.2d 979, 980 (3d Dep't 1991) (plaintiff's "testimony established that defendant is a corporation owned by Roberto and Rocco Mastrantoni"); *Mineo v. Rand's Food Shops, Inc.*, 32 N.Y.S.2d 23, 24 (City Ct., N.Y. Co., 1941) (plaintiff established ownership of corporation by testimony of printed name on front window).

The other questions regarding Tappat raised in the Report, i.e., the suggestion that Helen Sieger owned the diamonds, are just that: questions and innuendo. There is not a single document in the record showing Helen Sieger was a shareholder of Tappat. The fact that Helen Sieger assisted her children in establishing Tappat by opening a bank account, performing transactions on behalf of Tappat, and serving as its officer, does not establish her ownership of Tappat. TD's treasurer may be the

---

[8] In all likelihood, any corporate documents relating to Tappat were in the Box, as were the assets of Tappat—the diamonds—and were removed by the burglars.

person opening bank accounts for TD but that does not make him or her a TD shareholder. Similarly, the Report's reference to attorney Nash's letter (Report at 40) is not admissible evidence. This unsworn letter is speculation, hearsay and inadmissible. Nash's unworn letter states only that he "believed" (i.e. he was speculating) that the items were property of the Estate. Nash's unsworn speculation was not based on personal knowledge or even hearsay because Nash never met nor communicated with Helen Sieger, Abraham Sieger (A.227-228) or Chana Brachfeld (A.2144). He had no knowledge concerning ownership of the Contents. As to the Report's reference that Tappat did not file tax returns, that is a misunderstanding of the tax laws. There is no evidence that Tappat was required to file an *income* tax return because the diamonds were never sold and Tappat did not receive any income. Moreover, there is no tax law that a corporation's failure to file tax returns would strip shareholders of their ownership interest in the corporation.

The Report apparently recognized that the court's suspicions were just that: suspicions and not facts based on admissible evidence. *See* Report at 42. As set forth above, the court held that it need not reach the question of ownership of the diamonds and instead relied on its conclusion of the lack of evidence showing that Abraham Sieger "held any position within Tappat" that would have given him actual

35

or apparent authority to bind Tappat to the assignment. That conclusion ignores the Abraham Sieger sworn Declaration, and at most the issue presents a question of fact.[9]

The Report held that the court should not consider the May 3, 2023 sworn statements of Bienenstock and Sieger concerning the settlement of the parties that explained the purpose for the assignments. Report at 55-57. In the first place, it is not necessary to reach the admissibility of these statements because the assignments on their face are valid. Second, the deposition testimony of the Bienenstocks and Abraham Sieger were entirely consistent with the settlement and assignment of all

---

[9] The Report stated that "the Court does not have to reach the issue of champerty or the other challenges to the validity of the assignments." Report at 47. Champerty would be mooted by the amended complaint adding the Assignors as plaintiffs. In any event, even without such amendment, the court's jurisdiction would not be affected by champerty because the Estate's assignment is not subject to champerty. *See* NY Judiciary Law §489. Additionally, champerty concerns a party's motivations behind entering a transaction, and is an affirmative defense that the party asserting has the burden to prove. *Phoenix Light SF Ltd. v. Bank of Mellon*, No. 14-Civ-10104, 2020 U.S. Dist. LEXIS 97865 (S.D.N.Y., June 3, 2020), citing *Bluebird Partners v. First Fid. Bank*, 94 N.Y.2d 726, 735-36, 709 N.Y.S.2d 865 (2000). *See Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 591 F.3d 116, 119 (2d Cir. 2010). Failure to plead champerty as an affirmative defense acts as a waiver, and the defendant is unable to raise it at a later date. *Id*.; *see also Travelers Int'l, A.G. v. Trans World Airlines*, 41 F.3d 1570, 1580 (2d Cir. 1994) (finding that parties' failure to assert affirmative defense waived that defense). In TD's answers to all iterations of the complaints in this action, TD failed to plead the affirmative defense of champerty. The first time that TD raised the defense was in its pre-motion letter to the District Court requesting permission to file its summary judgment motion. (A.1672). Pleading an affirmative defense of "lack of standing" does not encompass the affirmative defense of champerty. *See Phoenix Light SF Ltd., supra.*

Moreover, New York law is clear that receiving an assignment in settlement or for the purpose of enforcing a claim, is not champerty simply because the party intends to do so by litigation. *See Promenade v. Schindler El. Corp.*, 39 A.D.3d 221, 834 N.Y.S.2d 97 (1st Dept.2007); *Williams Paving Co. v. United States Fid. & Guar. Co.*, 67 A.D.2d 827, 413 N.Y.S.2d 73 (4th Dept.1979). TD's burden of proof establishing that the sole or primary intent and purpose of the *assignments* was for plaintiff to commence an action against TD and the other defendants was not met or even addressed by TD.

claims and rights from the Bienenstocks to BAT. For example, Yaakov Bienenstock's testimony was that his father-in-law, Greisman, told him that the purpose of the assignment was to prevent the Bienenstocks from being sued (A.366), while Chaya Bienenstock testified that the reason she executed the Assignment to BAT was because Abraham Sieger and Chana Brachfeld "promised not to have any claims against us for anything." (A.516). The sworn statements cannot be disregarded because none of the witnesses was "previously asked sufficiently precise questions to elicit the amplification or explanation" of prior [deposition] testimony." *Rule v. Brine*, 85 F.3d 1002 (2d Cir. 1996). Such statements are admissible so long as they do not contradict the prior testimony. *See, e.g., Villante v. Department of Corrections*, 786 F.2d 516, 522 (2d Cir. 1986). A review of Yaakov Bienenstock's deposition testimony at most can be characterized as the witness not recalling collateral facts such as the date when he signed the assignment and concerning the Burglary. *See* Report at 53. There is no contradiction whatsoever with the prior testimony.

## POINT III

### THE DISTRICT COURT SHOULD HAVE GRANTED BAT LEAVE TO AMEND THE COMPLAINT

The initial complaint misidentified TD's alarm company at the time of the Burglary. The second, third and fourth amended complaints were based on TD's identifications of its alarm companies, as TD misidentified them three times. (A.59-

60). Thus, those prior amendments should not be used to penalize BAT from amending the complaint now pursuant to Fed. R. Civ. P. Rules 15(a)(2), 17(a)(3) and 21, to add all plaintiffs that have any interest in the claims. All of the proposed new plaintiffs—the Assignors and Sieger&Brachfeld—were deposed in the case and no discovery is necessary as a result of the amendment.

The Owners are proper plaintiffs because as owners of the Contents (if the assignments are not recognized) they have direct claims. The fact that Tappat was dissolved by proclamation is no impediment to its serving as a plaintiff because the BCL permits a dissolved corporation to participate in actions "for the purpose of winding up" its affairs. BCL §1006(a)& (a)(4).

With respect to Sieger&Brachfeld, as Tappat's shareholders they have authority to appoint directors and officers, and act on behalf of Tappat. As the Estate's co-administrators they also have the authority to act on its behalf. Fed. R. Civ. P. 17(a)(1)(B) provides that the administrators of an estate may sue in their own names. Therefore, Abraham Sieger has standing to sue for all of the Estate's claims. *See King v. Wang*, No. 14-civ-7694, 2018 U.S. Dist. LEXIS 49659, 2018 WL 1478044 (S.D.N.Y., March 26, 2018) ("as preliminary executrix, Y.K. King now has standing to sue on behalf of the Estate").

This Court in *Advanced Magnetics, Inc.,* 106 F.3d at 21, made it crystal clear that where an assignment is ineffective, the complaint may be amended to include the proper plaintiffs, i.e., the original assignors:

> We conclude that leave to file the proposed amended complaint substituting the selling shareholders [assignors] as plaintiffs to pursue their own claims should have been granted under Rule 17(a). Those claims will relate back to the date of the original complaint under the express terms of that Rule.

In determining a motion to amend to include the proper parties, "Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's *factual allegations* as to the events or the participants." *Advanced Magnetics,* 106 F.3d at 20 (emphasis added). "[T]here plainly should be no dismissal where substitution of the real party in interest is necessary to avoid injustice." *Id*; *see also Esposito v. United States,* 368 F.3d 1271, 1276 (10th Cir. 2004) (permitting amendment to add real party in interest where mistake is honest).

The Court in *Advanced Magnetics* also made it clear that Rule 15 applied to the amendment for the change of plaintiffs. 106 F.3d at 19-20. This includes a relation back to the date of filing of the initial complaint for statute of limitations purposes. Rule 15(a) provides that leave to amend a party's pleading "shall be freely given when justice so requires." "Leave to amend should be given absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue

39

prejudice to the opposing party, or futility." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000) (citations omitted) (Leave to amend is generally allowed in the absence of a showing by the nonmovant of prejudice or bad faith). If the proposed amendment "alleges facts or circumstances which may be a proper subject of relief, the suitor, in the absence of sufficient reasons for denying him this opportunity, should have a chance to test his claim on the merits." *Middle Atlantic Utilities Co. v. S. M. W. Development Corp.*, 392 F.2d 380 (2d Cir. 1968).

The standards of Rules 15, 17 and 21 are met here. First, the *factual allegations* in the proposed amended complaint have not changed. Second, there is no indication of bad faith or attempt to deceive. The assignments intended to consolidate in BAT the Bienenstocks', Tappat's and the Estate's ownership and rights to the Box, its Contents and all claims relating thereto. This was not deceptive nor bad faith, as BAT had provided all assignments early in discovery, submitted the BAT operating agreement to the Court, and all of BAT's witnesses were questioned concerning the assignment and BAT. (A.93-105,160,168). Third, joining the Bienenstocks and the Owners as plaintiffs would not prejudice defendants, who always had ample notice that BAT's claims derived from the Bienenstocks, Tappat and the Estate, and which deposed each of these proposed plaintiffs.

The District Court erred in denying leave to amend based on purported delay and prejudice to defendants.

### A. **Plaintiff Did Not Delay And Any Time Lag Was Excusable**

Plaintiff did not delay in filing its motion for leave to amend.  In opposition to defendants' motions for summary judgment, plaintiff requested permission to amend should the court grant defendants' motions. (A.8696-8707).  In addition, after filing its opposition and before the court decided defendants' motions, plaintiff moved for leave to file its amended complaint. (A.9584).  In its motion, plaintiff made it clear that the proposed additional plaintiffs in the amended complaint would cure any purported defects claimed by defendants.  The court should have granted plaintiff leave to amend, which would have mooted defendants' summary judgment motions.  Even if this were considered delay, which it is not, any purported delay was excusable.  When, as here, the plaintiff has a reasonable belief that it is, in fact, the real party in interest, it is permitted to wait until after the court rejects its position before seeking substitution, as this Court permitted the plaintiff to do in *Advanced Magnetics*, *supra.*  Another example is *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig,* No. 03 MDL 1529 (LMM), 2009 WL 1490599, at *3 (S.D.N.Y. May 21, 2009) where the court rejected the argument that "a party faced with a Rule 17(a) objection in a motion must forthwith seek ratification, joinder or substitution at that party's peril, even if the party takes a different view of the validity of the objection."  Instead, the court held, "such a party is surely acting reasonably if it awaits the court's decision of the motion." *Id.*

In *National Credit Union Administration Board, v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 675 (S.D.N.Y. 2019), the plaintiff waited more than three years after an objection was filed to its derivative standing, and waited for the court to rule on the issue before offering a substitution. In the meantime, in parallel litigation before other judges, the plaintiff's standing argument was failing. The defendant argued that the plaintiff's substitution offer was untimely. The court noted that in other cases, the courts first ruled against the plaintiffs and then permitted it to replead. Accordingly, it held that the request to substitute, made more than three years after the motion was filed, was timely. *Id.*

Appellate cases from other circuits are to similar effect. In *Jones v. Las Vegas Metro. Police Dep't,* 873 F.3d 1123 (9th Cir. 2017), the defendants argued in their summary judgment motion, filed on November 8, 2013, that the plaintiffs had not named a plaintiff with standing. The Nevada district court granted that motion on November 6, 2014. Thereafter, on November 11, 2014, the plaintiff sought leave to amend to name a plaintiff with standing. The district court refused to grant Rule 17(a)(3) relief, deeming the motion untimely. The Ninth Circuit, reviewing for abuse of discretion, reversed. The court explained that "Rule 17 relief is available where counsel makes an understandable error in naming the real party in interest." *Id.* at 1128. It determined that the plaintiffs had understandably thought they named the correct plaintiff, but that once the district court granted summary judgment, it

"disabused the plaintiffs of this notion. Once this occurred, Rule 17 required the district court to give plaintiffs a reasonable opportunity to cure their error." *Id.* at 1128-29. Thus, "[r]ather than enter judgment immediately after noting the deficiency, the district court should have given plaintiffs a reasonable opportunity to substitute the right party." *Id.* at 1129.

Similarly, in *Esposito,* the plaintiff filed a tort case on behalf of a dead person rather than naming the decedent's heirs. *See* 368 F.3d at 1272. The defendant moved to dismiss the case, and the district court granted the motion. *Id.* It then issued an order to show cause within 10 days why substitution should be permitted. *Id.* The plaintiff's attorney averred that he had made an honest mistake, and the district court denied the motion to substitute on the ground that while the mistake was honest, it was not understandable. The Tenth Circuit reversed, holding that the honest mistake was grounds that required relief—even though no request to substitute had been made before the dismissal order. *See id.* at 1277.

In our case, the argument made by TD and accepted by the District Court that there was undue delay, does not comport with the above cases holding that the motion may, or even should, await the Court's ruling on standing. The test is not whether BAT should have known earlier that defendants would be challenging its standing (*see* Report at 63-64); rather, the motion is made after the ruling on

43

standing. The summary judgment motions were the first time the issue of standing was ruled against BAT.

The court should have afforded a reasonable time to substitute in the proper party. *See, e.g., Am. Optical Co. v. Curtiss,* 56 F.R.D. 26 (S.D.N.Y. 1971) (granting assignor of voided assignment 10 days to join lawsuit pursuant to Rule 17). Accordingly, an amendment of the complaint pursuant to Rule 15 would not appear to even be necessary in light of Rule 17. Certainly, the District Court should have granted the motion for leave to amend pursuant to Rule 15 to add the names of any parties the court determined to be the real parties in interest.

### B. There Was No Prejudice to Defendants

Although "prejudice" should not be an issue given that amendments to correct standing should await the ruling on plaintiff's standing, there is no prejudice here. Contrary to the Report (at page 65), the factual allegations in the complaint are already well established and the proposed amendment would not raise any new facts or allegations -- the sole material difference is the inclusion of Tappat, the Estate, their principals and the Bienenstocks. All proposed plaintiffs have already been deposed. The suggestion that the new amendment would require an inquiry into the winding up of the Tappat business or diversity issues is specious. It has nothing to do with standing or with any of the merits.

It is also of no consequence that the title of the first claim for relief was reworded from breach of contract to breach of bailment. This Court in *Advanced Magnetics,* 106 F.3d at 20 specified that we look to a change in the "*factual allegations* as to the events or the participants." (emphasis added). As discussed above, pursuant to New York law, defendants' liability arises from the bailee/bailor relationship and the fact that the Bienenstocks were bailors has been part of this case since its outset in 2015. (A.65). Indeed, there is not a single *factual* allegation in the proposed amendment that has not been part of this case all along.

Equally specious is the argument that the new declarations open up the matter to additional discovery because New York's statute of frauds is somehow implicated since the assignments arise from an oral agreement among the parties. (Report at 66). First, assignments may be verbal and are not subject to New York's statute of frauds. *See e.g. Hooker v. Eagle Bank of Rochester,* 30 N.Y. 83 (1864). Second, the assignments are what govern the obligations of the parties, not prior conversations. The prior oral agreement merely demonstrates the *purpose* for the assignments.

## C. The Amendment Is Not Futile

The District Court decided that it does not have to reach the issue of whether it would be futile for the amendment to issue. Report at 68. The court commented that BAT somehow gambled with the outcome of a determination on standing. That,

45

of course, has nothing to do with futility. In any event, as discussed above, the courts provide for such amendments after the issue of standing is tested in the court and a ruling ensues.

## POINT IV

### SUMMARY JUDGMENT SHOULD HAVE BEEN GRANTED AGAINST TD AND FOR A FINDING OF SPOLIATION AGAINST TD AND HALIFAX

#### A. Summary Judgment Should Have Been Awarded to BAT

In a bailment case, the plaintiff has the burden to show that the property was entrusted to the defendant bailee. Once plaintiff establishes the bailment,

> It necessarily follows, from the nature of the obligation and the refusal to return the property, that the burden of showing the circumstances of the loss rests upon the bailee, and, unless the evidence shows the exercise of due care by him according to the nature of the bailment, he will be held responsible for the breach of his contract to return the property bailed....Thus, the obligation of the bailee is to explain not only why the bailed property cannot be returned but also how he cared for the property.

*Ouderkirk v. C.N. Bank,* 119 N.Y. 263, 267, 23 N.E. 875 (1980), (citing and quoting *Fidelity & Guar. Ins. Corp. v. Ballon,* 280 A.D. 373, 375, 113 N.Y.S.2d 546 (1st Dep't 1952)); *Jay Howard, Inc. v. Rothschild,* 16 A.D.2d 628, 226 N.Y.S.2d 769 (1st Dep't 1962)).

BAT satisfied its initial burden of a bailment and of the Contents that were held by TD as bailee. In addition, BAT established that TD acted with gross

negligence (even though BAT is required to only show TD's negligence). TD's negligence also is established by the expert report of Jeffrey Zwirn. (A.4127-4152).

TD as bailee has "the burden of advancing an adequate explanation of the reasons for its failure to properly return stored property." *ICC Metals v. Municipal Warehouse Co.,* 50 N.Y.2d 657, 666, 431 N.Y.S.2d 372 (1980). TD cannot establish that it maintained an adequate security system because TD admits that for three years prior to the Burglary the New Alarm System and Communications Lines experienced regular communication outages and TD failed to take any action to repair the problem. TD also directed COPS and its own NOC to ignore the signal received when the burglars cut the Communications Lines. Moreover, TD and its experts cannot offer any admissible evidence or testimony that it met the standard of care or complied with the Bank Protection Act (the "BPA"). TD destroyed (i) the security system and its components; (ii) documents establishing the existence of the security system; and (iii) the purchase order, invoice, installation documentation, blueprints of the security system. In fact, TD does not even know which components the security system possessed and which sensors were connected to the security system or where they were placed. Nor did TD preserve critical videos. TD's expert report consists of rank speculation and is not based on any admissible evidence.

TD also cannot establish that it complied with the BPA, 12 CFR §§21.2 *et seq.,* or industry standards. On the contrary, TD's testimony and paltry document

production establish that TD's security management was unqualified and made decisions without considering any of the requirements of the BPA and industry standards. For example, the BPA requires TD to designate a Security Officer, but it did not. TD failed to comply with 12 CFR §21.3(a)(4)(b)(5) because Minster was the sole decision maker and Minster was not the security officer. (A.5421, TD 56.1 ¶237). Minster unilaterally determined to remove the Bosch System with its Wireless Backup and to install a New Alarm System that did not include the DMP Cell Backup (listed on the contract), and audible sound device. Minster did not have the expertise to make these decisions. He was never designated as TD Security Officer and should not have acted the part.

Without any valid reason, TD failed to include a DMP Cell Backup sound device in the New Alarm System. (A.5422, TD 56.1 ¶243; SA.1446). Pursuant to 12 CFR §21.3, TD was required to consider the low cost of the components, including the DMP Cell Backup, before excluding them from the New Alarm System. When considering that the cost of the DMP Cell Backup was only about $1,200 (labor costs included), the Branch housed millions of dollars of customers' funds and assets, and TD is a global bank with net profits in the billions of dollars, there is no legitimate question that TD should have installed the DMP Cell Backup.

Moreover, the failure to install the DMP Cell Backup constitutes gross negligence on its face. For three years, TD and COPS were receiving

communication outages alerts from the New Alarm System and the Communications Lines. Yet, TD did nothing to determine the cause of the issue or to make any repair. It is undisputed that TD rectified a similar if not identical issue concerning Communication Outages at another branch prior to the Burglary (A.8128-8130), but TD refused to fix the issue at the Branch until after the Burglary. (A.5420-21, TD 56.1 ¶¶233, 234, 235). Not surprisingly, within a few days of the Burglary, TD had a DMP Cell Backup installed and fully operational at the Branch. (SA.1524).

TD also violated 12 CFR § 21.3(a)(4)(b)(4), which requires TD to have an "alarm system or other appropriate device for promptly notifying the nearest responsible law enforcement officers of an attempted or perpetrated robbery, burglary or larceny." In response to the three years of repeated communications failures caused by the defective New Alarm System and Communications Lines, TD and ISS directed COPS to ignore all such alarm signals and not to notify the police. By this negligence, TD, ISS and COPS neutered the ability of the New Alarm System to "promptly notify[] the nearest responsible law enforcement officers of an attempted or perpetrated robbery, burglary or larceny," in violation of the BPA and industry standards.

BAT established its damages. It is well settled that the measure of damages in a bailment case is the replacement or retail cost of the items. *See Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.,* 435 N.Y.S.2d 438, 439 (N.Y.Sup.Ct.1980), *aff'd*

49

*as modified on other grounds,* 81 A.D.2d 650 (N.Y.App. Div.2d Dep't 1981), *aff'd without opinion,* 54 N.Y.2d 891 (1981); *Dubiner's Bootery, Inc. v. Gen. Outdoor Adver. Co., Inc.,* 10 A.D.2d 923, 923 (1st Dep't 1960) (the measure of damages is the "replacement cost and any damages actually sustained by reason of the absence of the articles while in the process of replacement.").

Plaintiff's expert, Palmieri, established that the retail cost of the diamonds at the time of the Burglary was $10,082,642. (A.2899). TD's expert's report does not dispute the retail cost of the diamonds. In addition, TD does not dispute that there was $410,000 in cash in the Box. (A.5383, TD 56.1 ¶31). Therefore, the court should have granted BAT $10,492,642, in principal damages and 9% interest thereon from the date of the Burglary, August 5, 2012. CPLR §5001.

## B. TD And Halifax Spoliated Evidence

Defendants violated their duties to preserve all evidence as mandated by well settled caselaw as well as the District Court's October 22, 2015 Preservation Order of all evidence. [Dkt 8]. The defendants destroyed (i) the New Alarm System and all of its components; (ii) all documents concerning the installation and purchase of the New Alarm System; and (iii) all but 12 minutes of the video recordings.

The prejudice to plaintiff is immense. As set forth above, TD's own documents show TD was well aware that the New Alarm System and the Communications Lines were defective and caused communication outages. Had

the alarm system been left intact, BAT could have had its expert analyze the New Alarm System to determine the cause of three years of claimed communication outages, if it was operational, and properly maintained, and download all of the memory and history contained in the New Alarm System's chips and memory.

Likewise, the prejudice to plaintiff of the destruction of the video recordings are extremely significant because TD and its expert assumed, without evidence, that the burglars were only present in the vault and would not have been seen through the Branch's large windows had law enforcement been dispatched. (A.3823). But the undisputed evidence shows that the burglars created a second hole in the ceiling in the area outside the vault. (A.5413, TD 56.1 ¶¶205, 206, 207, 208, 209; SA.745, 1524). This second hole gave the burglars access to the entire area of the Branch outside the vault. The destroyed videos would have shown the presence of the burglars outside the vault area thereby nullifying this argument by TD's expert.

Spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Byrnie v. Town of Cromwell, Board of Education,* 243 F.3d 93, 107 (2d Cir.2001) (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999)). Spoliation may give rise to sanctions, including the preclusion of evidence. *See, e.g., Orbit One Communications, Inc. v. Numerex Corp.,* 271 F.R.D. 429, 435 (S.D.N.Y. 2010). Although typically the question of

sanctions for spoliation arises in connection with the destruction of evidence after a lawsuit has commenced, *see, e.g., Kronisch v. United States*, 150 F.3d 112, 126-27 (2d Cir. 1998); *McClendon*, 262 F.R.D. at 287-88, "[a] party has the obligation to preserve evidence when the party is on notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Whitney v. JetBlue Airways Corp.*, No. 07 CV 1397 (CBA), 2008 WL 2156324, at *3 (E.D.N.Y. Apr. 29, 2008) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001) (internal quotations omitted).

Courts in this Circuit generally require a party seeking sanctions for spoliation to establish three things: (1) that the party responsible for destroying the evidence had a duty to preserve it; (2) that the evidence was destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to a claim or defense of the party seeking sanctions such that a reasonable trier of fact could find that it would support that claim or defense. *See, e.g., Residential Funding Corp. v. Degeorge Financial Corp.*, 306 F.3d 99, 107-08 (2nd Cir. 2002); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107-08 (2nd Cir. 2001); *Whitney*, 2008 WL 2156324, at *3; *Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010). The Second Circuit has asserted that negligence alone may be sufficient to meet the culpable-state-of- mind requirement, *Residential Funding Corp.*, 306 F.3d at 108.

In *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001), this Court stated that "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." (*citing Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).

Given the fact that a Burglary had occurred at a bank where dozens of safety deposit boxes were violated, it was readily apparent that evidence concerning security and alarm equipment would be relevant to any prospective claims and litigation. Indeed, the internal TD correspondence referenced that box holders would need to be put on notice of the Burglary. (SA.1554). Moreover, TD is required by the Sarbanes Oxley Act, 18 USCS §1512, and its own corporate policies (A.5531), to retain all relevant documents until after all claims have been resolved.

Like TD, Halifax had notice of the Burglary right after it occurred; the company's personnel appeared at the Branch the following day to install new components that were broken during the Burglary and the DMP Cell Backup that was missing at the time of the Burglary. (SA.1524). Halifax knew that it had installed and maintained the alarm panel at the Branch, and that it possessed, at a minimum, information relevant to anyone that may be asserting claims.

The evidence showed that the spoliation was no accident. Minster, TD and Halifax knew better than to destroy the New Alarm System. They all knew that

system could have been tested under the exact conditions after the Burglary. Instead, they destroyed it. Similarly, the lost videos from the cameras would indicate whether or not the Burglars entered the non-vault portions of the Branch, which is highly relevant to TD's causation defense argument.

All prongs have been met for a finding of spoliation. Sanctions should have been awarded, including the striking of TD's and Halifax's answers. At a minimum, TD's expert's unsubstantiated claim should not be permitted and an adverse inference should issue concerning the parties' culpable conduct. *See Residential Funding Corp.,* 306 F.3d at 113 (2d Cir. 2002) ("[D]iscovery sanctions . . . may be imposed upon a party that has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence.").

## CONCLUSION

For the above reasons, the Court should reverse the Order and Judgment below and deny summary judgment in favor of defendants. If deemed necessary, upon reversal, the Court should grant BAT leave to file a Fifth Amended Complaint. Alternatively, upon reversal, the Court should grant summary judgment in favor of BAT against TD, and remand the matter to the District Court to determine the appropriate sanctions for TD's and Halifax's spoliation.

Dated:       Brooklyn, New York
              February 18, 2025

                          **STAHL & ZELMANOVITZ**

                  By:   /s/ Joseph Zelmanovitz
                          Joseph Zelmanovitz
                          747 Third Avenue, Suite 33B
                          New York, NY 10017
                          212-826-6422
                          jzelmanovitz@szlawllp.com

                            & 

                  **HAHN EISENBERGER PLLC**

                  By:   /s/ Elliot Hahn
                          Elliot Hahn
                          Hahn Eisenberger PLLC
                          969 East 27th Street
                          Brooklyn, New York 11210
                          347-410-5800
                          ehahn@hahneisenberger.com
                          *Attorneys for Plaintiff-Appellant BAT LLC*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,072 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated:  Brooklyn, New York
       February 18, 2025

Respectfully submitted,

**STAHL & ZELMANOVITZ**

By:   /s/ Joseph Zelmanovitz
      Joseph Zelmanovitz
      747 Third Avenue, Suite 33B
      New York, NY 10017
      212-826-6422
      jzelmanovitz@szlawllp.com

        & 

**HAHN EISENBERGER PLLC**

By:   /s/ Elliot Hahn
      Elliot Hahn
      Hahn Eisenberger PLLC
      969 East 27th Street
      Brooklyn, New York 11210
      347-410-5800
      ehahn@hahneisenberger.com
      *Attorneys for Plaintiff-Appellant BAT LLC*

**SPECIAL APPENDIX**

## **Table of Contents**

**Page**

Order Adopting Report and Recommendation of the
　　Honorable Nina R. Morrison, dated September 26, 2024.............. SPA1

Judgment of the United States District Court, Eastern District
　　of New York, entered September 27, 2024 .................................. SPA10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BAT LLC,

                    Plaintiff,

          v.                                          15-cv-5839 (NRM) (CLP)

TD BANK, N.A., HALIFAX SECURITY,          **ORDER ADOPTING REPORT**
INC., d/b/a NORTH AMERICAN VIDEO,          **AND RECOMMENDATION**
HALIFAX SECURITY, INC., LYDIA
SECURITY MONITORING, INC., d/b/a
COPS        MONITORING       and
INTEGRATED SECURITY SYSTEMS,
                    Defendants.

NINA R. MORRISON, United States District Judge:

          In this action, Plaintiff asserts violations of New York Banking Law § 338 as

well as gross negligence, breach of bailment contract, and breach of contract.  The

underlying dispute arises from losses asserted by Plaintiff from the theft of certain

high-value items that were stored in a safe deposit box at a TD Bank branch in

Brooklyn, New York, and which were seized by intruders in 2012.

          This Court referred a series of interrelated motions to the Hon. Cheryl L.

Pollak, United States Magistrate Judge, for a Report and Recommendation.  As

described below, the Court adopts Magistrate Judge Pollak's detailed and well-

reasoned Report and Recommendation in full.

                              **BACKGROUND**

          On August 3, 2015, Plaintiff BAT LLC ("BAT") commenced the instant action,

asserting violations of New York Banking Law § 338 as well as gross negligence,

1

breach of bailment contract, and breach of contract.  Plaintiff alleges that it is owed damages arising from the theft of certain high-value items — including what Plaintiff contends were millions of dollars' worth of diamonds — that were stored in a safe deposit box at a TD Bank branch in Brooklyn, New York, and which were seized by still-unidentified intruders who breached the Bank's security systems in August 2012.

Plaintiff originally brought this suit against Defendant TD Bank ("TD Bank" or "the Bank") and a second Defendant (ADT LLC) who has since been voluntarily dismissed from the case.  In the nine years since the lawsuit was commenced, the parties — who now include a total of four Defendants — have engaged in extensive discovery, and Plaintiff has amended its complaint three times.  The present record entails hotly disputed claims between the remaining parties regarding, *inter alia*, which persons, estates, or other entities have a lawful ownership interest in the stolen contents of the safe deposit box.  In particular, the parties dispute whether Plaintiff BAT — which alleges that it is a limited liability company with the right to sue to recover certain losses arising from the August 2012 break-in at the Bank — has standing to assert the state law claims at issue in this action.

On December 20, 2022, this Court referred a series of interrelated motions to the Hon. Cheryl L. Pollak, United States Magistrate Judge, for a Report and Recommendation ("R&R").  These included:  (1) four motions for summary judgment filed by Defendants Lydia Security, Halifax, TD Bank, and Integrated Security

2

Systems[1] (ECF Nos. 304, 305, 306, 309); (2) Plaintiff's cross motion for summary

judgment and spoliation against Defendants TD Bank and Halifax (ECF No. 322);

(3) TD Bank's motion to preclude Plaintiff's expert Donald Palmieri (ECF No. 307);

(4) Plaintiff's motion to preclude Defendants' various experts (ECF No. 321); and (5)

Plaintiff's motion to amend the Complaint (ECF No. 354).

On March 30, 2024, Judge Pollak issued a seventy-eight-page R&R

recommending dismissal of the entire action due to lack of subject matter

jurisdiction. Specifically, Judge Pollak concluded that, even viewing the record in

the light most favorable to Plaintiff, Plaintiff lacked Article III standing to assert

the claims in the Fourth Amended Complaint because BAT did not have valid "title

or ownership" in the underlying subject of the claims asserted (*i.e.*, the contents of

the safe deposit box at issue). Judge Pollak therefore recommended that this Court

grant Defendants' motion for summary judgment based on lack of subject matter

jurisdiction. Judge Pollak also recommended that the Court deny Plaintiff's motion

for leave to amend its complaint under Fed. R. Civ. P. 15(a)(2), 17, and 21 to add

four new individual plaintiffs ("the New Plaintiffs") whom BAT contended had

suffered the requisite injury-in-fact to confer standing to sue under Article III.

Finally, Judge Pollak recommended that the Court dismiss the parties' cross-

motions to preclude experts as moot; that the Court deny Defendant Integrated

Security Systems' motion for sanctions under Fed. R. Civ. P. 11(c); and that the

---

[1] Defendant Integrated Security Systems' motion includes a request for
sanctions against BAT. (ECF No. 294).

3

**SPA4**

Court deny Plaintiff's motion for sanctions against TD Bank and Defendant Halifax Security Holdings, Inc., for alleged spoliation of evidence concerning TD Bank's alarm system.

On April 15, 2024, Plaintiff timely filed objections to the R&R, insofar as the R&R recommended (1) summary judgment and dismissal of the action based on BAT's lack of standing, and (2) denial of leave to file a Fourth Amended Complaint. Each of the four Defendants filed its own memorandum in response to Plaintiff's objections, in which Defendants urged this Court to adopt Judge Pollak's R&R in full.

## DISCUSSION

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3). Following the issuance of a R&R, the parties are given an opportunity to file written objections to the R&R. *See* 28 U.S.C. § 636(b)(1). The district judge must evaluate *de novo* "any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *United States v. Drago*, No. 18-CR-0394 (SJF) (AYS), 2019 WL 3072288, *1 (E.D.N.Y. July 15, 2019) ("Any portion of such a report and recommendation to which a timely objection has been made is reviewed de novo."). However, where a party files an objection that is "conclusory or general . . . or

simply reiterates [the] original arguments," that portion of the R&R is reviewed "only for clear error." *Pall Corp. v. Entegris, Inc.*, 249 F.R.D. 48, 51 (E.D.N.Y. 2008) (quoting *Barratt v. Joie*, No. 96-cv-324, 2002 WL 335014, at *1 (S.D.N.Y. Mar. 4, 2002)). *See generally* Fed. R. Civ. P. 72(b)(3).

While substantial portions of Plaintiff's objections to the R&R merely restate its unsuccessful arguments before Magistrate Judge Pollak, out of an abundance of caution, this Court has conducted a *de novo* review of each of the two principal recommendations in the R&R to which Plaintiff objects: (1) Judge Pollak's conclusion that BAT lacks standing to bring this suit, and (2) her recommendation that leave to amend the complaint a fourth time be denied. Upon *de novo* review, the Court agrees with Judge Pollak's well-reasoned and thorough recommendations on both fronts. The Court has also reviewed the remainder of the R&R for clear error and finds none.

First, the Court fully concurs with Judge Pollak's finding that — even viewing the record in the light most favorable to Plaintiff, as is required at summary judgment — BAT lacks standing to pursue the claims in the Fourth Amended Complaint because it has not satisfied Article III's injury-in-fact requirement. *See Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992). In particular, the Court concludes that Plaintiff has not shown that it holds either "legal title or a proprietary interest in the claim[s]" at issue in this litigation. R&R at 22–23 (citing, *inter alia*, *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008)). For the reasons stated cogently in the R&R, the record provides

no reasonable basis to conclude that the purported assignment of rights by Yaakov and Chaya Bienenstock to BAT in 2015 ("the 2015 Bienenstock Assignment") was in fact a valid assignment of title and/or ownership in TD Bank's safe deposit box #198 at its Avenue U Branch in Brooklyn ("the Box") or its contents as they existed in 2012. Nor did the 2015 Bienenstock Assignment constitute a valid assignment to BAT of the 2010 lease agreement for the safe deposit box ("the Lease Agreement"). R&R at 3, 25, 29–30. The 2015 Bienenstock Assignment contains no language expressly transferring, or otherwise conveying, title or ownership of the subject of the claims at issue; instead, it transfers only the right to bring the claims themselves, and merely conveying power of attorney does not give BAT standing to bring suit in its own name. *See* R&R at 29–30.

Moreover, reviewing the record and applicable law *de novo*, the Court fully concurs with Judge Pollak's finding that even if the 2015 Bienenstock Agreement had expressly assigned title or ownership interest in the Box's contents to BAT, that, too, would not have been a valid assignment, because the Bienenstocks themselves "did not have title to or own any of the items in the Box." R&R at 29. The Court further finds that even if it were to grant BAT's request to consider the 2015 Estate Assignment and Tappat Assignment, *see* Pl. Obj. at 29–36; R&R at 24–25, 31–34, these assignments suffer from similar defects as the 2015 Bienenstock Assignment and are insufficient to confer standing on BAT to pursue the claims in this action.

**SPA7**

The Court further finds that in recommending summary judgment against Plaintiff and dismissal of the action for lack of standing, Judge Pollak properly excluded the alleged 2022 and 2023 Assignments from consideration, as both were produced for the first time after the close of discovery, in response to Defendants' anticipated motion for summary judgment. R&R at 48–51. The Court also agrees with Judge Pollak that the new Declarations from Abraham Sieger and Yaakov Bienenstock regarding an alleged "verbal agreement" as to BAT's formation and assignment of ownership rights among interested parties should be excluded from consideration, because the facts and theories they assert were not presented until seven years into this litigation. Plaintiff was on notice well before that time as to the relevant claims and defenses, and should have produced that information in discovery if it wished to rely upon it to defeat Defendants' standing challenge. R&R at 52–58.

As for Plaintiff's 2022 motion for leave to file a Fifth Amended Complaint more than seven years after initiating this lawsuit, the Court fully concurs with Judge Pollak's recommendation that the motion should be denied. R&R at 59–67. Plaintiff has not shown that it is entitled to amend its complaint a fifth time, particularly at this juncture of the litigation. While leave to amend should be freely given whenever justice so requires, allowing yet another amendment at this time and for the reasons asserted by Plaintiff would result in both undue delay and unfair prejudice to Defendants. *See* Fed. R. Civ. P. 15(a)(2); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Nor has Plaintiff shown that

amending its complaint to allow joinder and/or substitution of additional plaintiffs under Fed. R. Civ. P. 17 and 21 would be "merely formal" at this juncture, given that allowing the proposed amendments would entail substantial alterations to the factual allegations and legal bases for the claims themselves.  *See* R&R at 69–70; *Advanced Magnetics, Inc., v. Bayfront Partners*, 106 F.3d 11, 20 (2d Cir. 1997). Accordingly, Plaintiff's motion for leave to amend is denied in its entirety.

No party has objected to Judge Pollak's recommendation that this Court deny its respective motion for sanctions (in Plaintiff's case, a sanctions motion based on alleged spoliation of evidence; and in Defendant Integrated Security System's case, a motion for sanctions under Fed. R. Civ. P. 11(c)).  The Court has reviewed these portions of Judge Pollak's recommendations for clear error, *see* R&R at 72–77, and finding none, adopts her recommendations in full.

In light of the Court's dismissal of the action based on lack of subject matter jurisdiction, the parties' cross-motions to preclude expert witnesses are denied as moot.

## CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Pollak's Report and Recommendation dated March 30, 2024 in full.  Plaintiff's motion for leave to file a Fifth Amended Complaint is denied.  Defendants' motion for summary judgment is hereby granted, and the action is dismissed for lack of subject matter jurisdiction.

SO ORDERED.

_/s/ Nina R. Morrison_

NINA R. MORRISON
United States District Judge

Dated: Brooklyn, New York
    September 26, 2024

**SPA10**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
BAT LLC,

                      Plaintiff,                      JUDGMENT

      v.                                     15-cv-5839 (NRM) (CLP)

TD BANK, N.A., HALIFAX SECURITY, INC.,
d/b/a NORTH AMERICAN VIDEO, HALIFAX
SECURITY, INC., LYDIA SECURITY
MONITORING, INC., d/b/a COPS MONITORING
and INTEGRATED SECURITY SYSTEMS,

                      Defendants.
----------------------------------------------------------------X

      An Order of the Honorable Nina R. Morrison, United States District Judge having been

filed on September 26, 2024, adopting the Report and Recommendation of Magistrate Cheryl L.

Pollak, dated March 30, 2024, denying Plaintiff's motion for leave to file a Fifth Amended

Complaint; granting Defendants' motion for summary judgment; and dismissing this action for

lack of subject matter jurisdiction; it is

      ORDERED and ADJUDGED that Plaintiff's motion for leave to file a Fifth Amended

Complaint is denied; that Defendants' motion for summary judgment is  granted; and that the

action is dismissed for lack of subject matter jurisdiction.

Dated: Brooklyn, New York                 Brenna B. Mahoney
       September 27, 2024              Clerk of Court

                                  By:    */s/Jalitza Poveda*
                                          Deputy Clerk